UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KUMUD JINDAL, Individually and on Behalf of All Others Similarly Situated, | : : : : : | Case No. 1:14-cv-01651 |
| | : : | CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS |
| Plaintiff, | : : : | |
| v. | : : : : | |
| KEVIN M. MODANY, DANIEL M. FITZPATRICK, AND ITT EDUCATIONAL SERVICES, INC., | : : : : : : | |
| Defendants. | : : | |

Plaintiff, Kumud Jindal ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ITT Educational Services, Inc. ("ITT" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased ITT securities between April 26, 2013 and September 19, 2014, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b)  and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against the Company and certain of its top officials.

2.      ITT is a leading provider of postsecondary degree programs in the United States. The Company's institutes offer associate, bachelor, and master degree programs, as well as non-degree diploma programs. As of December 31, 2012, it provided its programs to approximately 61,000 students in 149 locations across 39 states, as well as online programs to students across 48 states.

3.      Throughout the Class Period, the Company misled investors regarding the integrity of its financial reporting, including the reporting of the trust (the "PEAKS Trust") that purchased, owns and collects private education loans under the PEAKS Private Student Loan Program (the "PEAKS Program").

4.      On March 21, 2014, the Company announced that it submitted an inquiry to the Office of the Chief Accountant ("OCA") of the SEC related to the accounting treatment for the variable interest entity involved in the PEAKS Program.

5.     On this news, the Company's shares fell $2.24, or over 7%, to close at $27.71 per share on March 24, 2014.

6.     On May 22, 2014, the Company announced that it was withdrawing its 2014 forecast and investors should no longer rely upon it due to uncertainties related to the accounting of its PEAKS Trust and the Company's guarantee obligations under the PEAKS Program.

7.     On this news, the Company's shares fell $5.30, or over 20%, to close at $20.50 per share on May 22, 2014.

8.     On June 24, 2014, the Company announced that it would need to restate the unaudited financial statements in its Quarterly Reports on Form 10-Q for each of the fiscal quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, and that they should no longer be relied upon.

9.     On September 19, 2014, the Company announced that it was notified by the Division of Enforcement of the SEC that it made the preliminary determination to recommend that the SEC file an enforcement action against the Company alleging violations of Sections 10(b), 13(a) and 13(b)(2) of the Securities Exchange Act of 1934 and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13 and 13a-15 under the Exchange Act. The potential enforcement action stemmed from a previously disclosed SEC investigation concerning the Company's two private education loan programs for its students.

10.     On this news, the Company's shares fell $2.70, or over 35%, to close at $4.95 per share on September 19, 2014.

11.    During the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) ITT's financial statements contained errors related to the accounting of the PEAKS Trust and PEAKS Program; (2) the Company lacked adequate internal controls over financial reporting; and (3) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

12.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b 5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

15.    Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as ITT's headquarters are located in this District.

16.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities

of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17.    Plaintiff, as set forth in the attached Certification, purchased ITT securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosures.

18.    Defendant ITT is a Delaware corporation with its headquarters located at 13000 North Meridian Street, Carmel, Indiana.

19.    Defendant Kevin M. Modany ("Modany") has been at all relevant times the Company's Chief Executive Officer. Defendant Modany also served as Chairman of the Board of Directors from February 2008 until his resignation, effective August 4, 2014.

20.    Defendant Daniel M. Fitzpatrick ("Fitzpatrick") has been at all relevant times the Company's Chief Financial Officer.

21.    The Defendants referenced above in ¶¶ 19-20 are sometimes referred to herein as the "Individual Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

22.    ITT is a leading provider of postsecondary degree programs in the United States. As of December 31, 2012, it offered master, bachelor and associate degree programs to approximately 61,000 students with 149 locations across 39

5

states and online programs across 48 states.

23.     On February 22, 2013, the Company filed its Form 10-K for the fiscal year ending December 31, 2012 with the SEC and disclosed that it was being investigated by the SEC over, among other things, its accounting over its PEAKS Program and PEAKS Trust.

## Materially False and Misleading
## Statements Issued During the Class Period

24.     On April 26, 2013, the Company filed with the SEC a materially false and misleading Quarterly Reports on Form 10-Q for the period ending March 31, 2013, which was signed by Defendant Fitzpatrick. The Company reported revenue of approximately $287.7 million, total costs and expenses of approximately $235 million and net income of approximately $31.31 million or $1.33 diluted earnings per share. In addition, the Form 10-Q included signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Modany and Fitzpatrick falsely stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25.     On July 26, 2013, the Company filed with the SEC a materially false and misleading Quarterly Reports on Form 10-Q for the period ending June 30, 2013, which was signed by Defendant Fitzpatrick. The Company reported revenue of approximately $260 million, total costs and expenses of approximately $224.7 million and net income of approximately $20.9 million or $0.89 diluted earnings per share. In addition, the Form 10-Q included signed SOX certifications by Defendants

Modany and Fitzpatrick falsely stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

26.    On October 29, 2013, the Company filed with the SEC a materially false and misleading Quarterly Reports on Form 10-Q for the period ending September 30, 2013, which was signed by Defendant Fitzpatrick. The Company reported revenue of approximately $259 million, total costs and expenses of approximately $227.3 million and net income of approximately $18.9 million or $0.80 diluted earnings per share. In addition, the Form 10-Q included signed SOX certifications by Defendants Modany and Fitzpatrick stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

27.    On January 30, 2014, the Company issued a press release announcing its 2013 fourth quarter and full year results. The press release included the following chart reflecting the Company's internal goals for the twelve months ending December 31, 2014:

| | Internal Goals for the Twelve Months Ending December 31, 2014 | |
| --- | --- | --- |
| | Low End of Range | High End of Range |
| | (Dollars in thousands, except per share and per student data) | |
| New Student Enrollment in 2014 compared to 2013 | (2.0)% | 8.0% |
| Revenue per Student per Quarter | $4,300 | $4,500 |
| Free Cash Flow[c] | $75,000 | $100,000 |
| EBITDA[d] | $140,000 | $170,000 |
| Earnings per Share (diluted) | $3.00 | $3.65 |

28.     The statements referenced in ¶¶ 24 through 27 above, were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them, that: (1) ITT's financial statements contained errors relating to the accounting of its PEAKS Trust and PEAKS Program; (2) the Company lacked adequate internal controls over financial accounting; and (3) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

## The Truth Emerges

29.     On March 21, 2014, the Company issued a press release and filed a Form 8-K with the SEC announcing that it submitted a preclearance request to the OCA of the SEC on March 18, 2014 concerning the accounting treatment for the variable interest entity involved in the PEAKS Program.

30.     On this news, the Company's shares fell $2.24, or over 7%, to close at $27.71 per share on March 24, 2014.

31.     On May 22, 2014, the Company issued a press release and filed a Form 8-K with the SEC announcing that it was withdrawing its previously-disclosed internal goals for the twelve months ending December 31, 2014, which should no longer be relied on, due to uncertainties related to the accounting of its PEAKS Trust and the Company's guarantee obligations under the PEAKS Program.

32.     On this news, the Company's shares fell $5.30, or over 20%, to close at $20.50 per share on May 22, 2014.

33.     On June 24, 2014, the Company filed a Form 8-K with the SEC announcing that it will need to restate the unaudited financial statements in its Quarterly Reports on Form 10-Q for each of the fiscal quarters ending March 31, 2013, June 30, 2013 and September 30, 2013, which should no longer be relied upon, and expects to conclude that its disclosure controls and procedures were not effective as of March 31, 2013, June 30, 2013, September 30, 2013 and December 31, 2013 as a result of identifying at least one material weakness that led to the restatements. The Form 8-K states in relevant parts:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> *On June 18, 2014, the Audit Committee of the Board of Directors of ITT Educational Services, Inc. (the "Company") determined that, beginning on February 28, 2013, the Company should have consolidated the financial results of the trust (the "PEAKS Trust") that purchased, owns and collects private education loans made under the PEAKS Private Student Loan Program (the "PEAKS Program"), in the Company's consolidated financial statements (the "Consolidation").* The Company had previously treated the PEAKS Trust as an unconsolidated variable interest entity. As previously disclosed, on March 18, 2014, the Company submitted an inquiry to the Office of the Chief Accountant (the "OCA") of the Securities and Exchange Commission (the "SEC") related to whether the financial results of the PEAKS Trust should be consolidated in the Company's consolidated financial statements and, if so, during which periods. On June 18, 2014, the OCA told the Company that it had determined that it would be appropriate for the Company to consolidate the financial results of the PEAKS Trust in the Company's consolidated financial statements at the time that

the Company had the substantive unilateral right to remove the servicer of the private education loans owned by the PEAKS Trust and to consent to a replacement servicer. In consideration of the OCA's determination and following discussions with Company management, the Company's Audit Committee reached its conclusion that the Company should have consolidated the financial results of the PEAKS Trust in the Company's consolidated financial statements beginning on February 28, 2013. The Company's Audit Committee and management have each discussed the matters disclosed in this Item 4.02 with the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP.

The Company had previously concluded that it was not required to consolidate the financial results of the PEAKS Trust in its consolidated financial statements, because it was not the primary beneficiary of the PEAKS Trust. The Company believed that it was not the primary beneficiary of the PEAKS Trust, because it did not have the power to direct the activities that most significantly impact the economic performance of the PEAKS Trust. The Company determined that the activities of the PEAKS Trust that most significantly impact its economic performance involve the servicing of the private education loans owned by the PEAKS Trust. In connection with its inquiry to the OCA, the Company determined that February 28, 2013 was the first date that the Company could exercise its right to terminate the servicing agreement that governs the servicing activities of the private education loans owned by the PEAKS Trust, due to the failure of the entity that performs those servicing activities on behalf of the PEAKS Trust to meet certain performance criteria specified in the servicing agreement. As a result of this analysis and the OCA's determination, the Company concluded that it became the primary beneficiary of the PEAKS Trust on February 28, 2013, which was the first date that the Company could control the activities of the PEAKS Trust that most significantly impact the economic performance of the PEAKS Trust.

***As a result of its determination that the Company should have consolidated the financial results of the PEAKS Trust in the Company's consolidated financial statements beginning on February 28, 2013, the Company's Audit Committee concluded that the Company will need to restate the unaudited financial statements in its***

10

***Quarterly Reports on Form 10-Q for each of the fiscal quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, and that those previously-issued financial statements should no longer be relied upon. Further, the preliminary financial information included in the Company's press releases issued on January 30, 2014 and May 22, 2014, and provided during the conference calls on those same days, should no longer be relied upon***. The Company is in the process of preparing restated financial statements for each of the fiscal quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, and its financial statements for the fiscal quarter ended March 31, 2014 and for the year ended December 31, 2013, in each case to consolidate the financial results of the PEAKS Trust in the Company's consolidated financial statements. The Company hopes to file (i) the amendments to its Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, (ii) its Annual Report on Form 10-K for the fiscal year ended December 31, 2013, and (iii) its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2014, with the SEC as soon as practicable.

As described in the Company's previous filings with the SEC, the Company holds a variable interest in the PEAKS Trust as a result of the guarantee that it has provided to the PEAKS Trust and the subordinated note issued by the PEAKS Trust that is held by the Company (the "Subordinated Note"). On January 20, 2010, the Company and unrelated third parties entered into agreements that established the PEAKS Program, under which an unaffiliated lender originated private education loans to the Company's eligible students and, subsequently, sold those loans to the PEAKS Trust. The PEAKS Trust issued senior debt in the aggregate principal amount of $300 million ("PEAKS Senior Debt") to investors. The lender disbursed the proceeds of the private education loans to the Company for application to the students' account balances, and the Company transferred a portion of each disbursement to the PEAKS Trust in exchange for the Subordinated Note. The maturity date of the Subordinated Note is in March 2026. No new private education loans were or will be originated under the PEAKS Program after July 2011, but immaterial amounts related to loans originated prior to that date were disbursed by the lender through March 2012.

The Company guarantees payment of the principal and interest owed on the PEAKS Senior Debt, the administrative fees and expenses of the PEAKS Trust and the minimum required ratio of assets of the PEAKS Trust to outstanding PEAKS Senior Debt ("PEAKS Guarantee"). The PEAKS Guarantee agreement contains, among other things, representations and warranties and events of default customary for guarantees. In addition, under the PEAKS Program, some or all of the holders of the PEAKS Senior Debt could require the Company to purchase their PEAKS Senior Debt, if a legislative change is enacted into law to reduce the maximum allowable percentage of the Company's cash revenues derived from funding under Title IV (the "Title IV Programs") of the Higher Education Act of 1965, as amended ("HEA"), from 90% to 75% or less. At this time, the Company believes that the likelihood of such a legislative change is remote. The Company's guarantee and purchase obligations under the PEAKS Program remain in effect until the PEAKS Senior Debt and the PEAKS Trust's fees and expenses are paid in full. At such time, the Company will be entitled to repayment of the amount of any payments it made under the PEAKS Guarantee (which do not include payments on behalf of borrowers that the Company made) to the extent that funds are remaining in the PEAKS Trust.

The Consolidation will result in a significantly different presentation in the Company's consolidated financial statements of the Company's transactions with the PEAKS Trust. All transactions between the Company and the PEAKS Trust will be eliminated from the Company's consolidated financial statements beginning with the consolidated financial statements as of February 28, 2013. The Company will no longer record a contingent liability for the PEAKS Guarantee on its consolidated balance sheet beginning February 28, 2013 and continuing as long as the Consolidation is applicable. The Company's obligations under the PEAKS Guarantee, however, will remain in effect, until the PEAKS Senior Debt and the PEAKS Trust's fees and expenses are paid in full. Further, the PEAKS Guarantee will no longer be considered an off-balance sheet obligation of the Company after February 28, 2013 and continuing as long as the Consolidation is applicable. The assets and liabilities of the PEAKS Trust will be included on the Company's consolidated balance sheet, as described below.

As a result of the Consolidation, for accounting purposes, the assets and liabilities of the PEAKS Trust will be treated as having been acquired by the Company at their fair values as of February 28, 2013. Based on a preliminary, unaudited assessment of the fair values of the PEAKS Trust assets and liabilities as of February 28, 2013 and the elimination of intercompany transactions, the Company believes that, as a result of the Consolidation, it will recognize an additional pre-tax charge in the range of approximately $65 million to $75 million in its consolidated financial statements for the three months ended March 31, 2013. This estimate of the range of the additional pre-tax charge is preliminary and subject to change. The estimated fair values of the assets and liabilities of the PEAKS Trust as of February 28, 2013 will be disclosed in the Company's notes to consolidated financial statements included in its Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2013, June 30, 2013 and September 30, 2013 and its Annual Report on Form 10-K for the year ended December 31, 2013. The assets of the PEAKS Trust consist primarily of the private education loans owned by the PEAKS Trust. The Company believes that a significant number of those private education loans will be determined to be credit impaired upon consolidation. The liabilities of the PEAKS Trust consist primarily of the PEAKS Senior Debt and the Subordinated Note. The PEAKS Senior Debt matures in January 2020 and bears interest at a variable rate based on the London Interbank Offered Rate ("LIBOR"), plus a 550 basis point margin. The minimum LIBOR rate applied to the PEAKS Senior Debt cannot be less than 2.00%. There are no scheduled principal repayment requirements for the PEAKS Senior Debt prior to the January 2020 maturity date. Under the terms of the PEAKS Program documents, however, amounts received on a monthly basis by the PEAKS Trust that exceed the fees and expenses of the PEAKS Trust then due and the interest then due on the PEAKS Senior Debt are to be paid to reduce the outstanding principal balance of the PEAKS Senior Debt. As of May 31, 2014, the outstanding principal balance of the PEAKS Senior Debt was approximately $214.5 million. The assets of the PEAKS Trust serve as collateral for, and are intended to be the principal source of, the repayment of the PEAKS Senior Debt. The PEAKS Senior Debt may be accelerated by the indenture trustee of the PEAKS Trust or by the holders of the PEAKS Senior Debt in response to certain events of default under the indenture under the PEAKS Program, including, among other things,

defaults in payments by the PEAKS Trust, defaults in the performance or observation of the PEAKS Trust's covenants, agreements or conditions under the indenture, a breach of the Company's obligations under the PEAKS Guarantee agreement, and certain bankruptcy events with respect to the PEAKS Trust or the Company.

In addition, the PEAKS Trust must maintain a minimum required ratio of assets of the PEAKS Trust to outstanding PEAKS Senior Debt (the "Asset/Liability Ratio"). The minimum required Asset/Liability Ratio is 1.05/1.00. The applicable required Asset/Liability Ratio as of each monthly measurement date, however, is based on the Company's compliance, as of the prior quarterly measurement date, with certain metrics specified in the PEAKS Program documents, including maximum leverage ratios and minimum liquidity amounts. If the Company is not in compliance with those metrics as of the end of a fiscal quarter, the required Asset/Liability Ratio increases to 1.40/1.00, until the monthly measurement date following the end of a succeeding quarter at which the Company is in compliance with those metrics. As a result of the Consolidation and its related impact on the Company's consolidated financial statements, the Company believes that it may not have been in compliance with those metrics at various past measurement dates after February 28, 2013, and may not be in compliance with those metrics in the remainder of 2014. The Company is still evaluating the full impact of the Consolidation on those metrics. If the amount of the assets of the PEAKS Trust does not equal or exceed the outstanding PEAKS Senior Debt by the applicable required Asset/Liability Ratio on a monthly measurement date, the Company is required to make payments under the PEAKS Guarantee in amounts that will reduce the outstanding principal balance of the PEAKS Senior Debt to the extent necessary to cause the ratio of the assets of the PEAKS Trust to the resulting outstanding PEAKS Senior Debt to equal or exceed the applicable required Asset/Liability Ratio. Based on the Company's current estimates, which are based on numerous assumptions and are subject to change, the Company believes that it will be required to make additional payments under the PEAKS Guarantee of approximately $115.3 million in the remainder of 2014 related to its obligations under the PEAKS Guarantee. That estimated amount is in addition to the approximately $1.4 million previously paid by the Company in 2014 to date under the

PEAKS Guarantee and the $40.0 million that the Company paid in March 2014 pursuant to a letter agreement dated as of March 17, 2014 that the Company entered into with the trustee under the PEAKS Program and the holders of the PEAKS Senior Debt. The $40.0 million was applied primarily to make a mandatory prepayment of the PEAKS Senior Debt. Based on the Company's current estimates, which are based on numerous assumptions and are subject to change, the Company believes that, after 2014, it will be required to make additional payments under the PEAKS Guarantee of:

- approximately $3.0 million in 2015;
- no amounts in 2016 through 2019; and
- approximately $29.8 million in early 2020, primarily to pay off the balance of the PEAKS Senior Debt on the maturity date.

As a result of the Consolidation, the Company believes that it may not be in compliance with certain of its covenants at various dates under the Credit Agreement, dated as of March 21, 2012, as amended by the First Amendment thereto dated as of March 31, 2014 and the Second Amendment thereto dated as of May 29, 2014, among the Company, the lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Bank of America, N.A., as syndication agent, and Wells Fargo, N.A., as documentation agent (the "Credit Agreement). The Company is still evaluating the full impact of the Consolidation on its covenants under the Credit Agreement, and is in discussions with the lenders under the Credit Agreement regarding the impact of the Consolidation and a possible waiver or amendment of affected covenants at the affected times and other matters, but there can be no assurance that such a waiver or amendment will be obtained on terms satisfactory to the Company or at all. If the Company is not in compliance with one or more covenants and is unable to obtain a waiver or an amendment to the Credit Agreement that would allow it to be in compliance with those covenants, the lending commitments under the Credit Agreement may be terminated and all then outstanding borrowings and other amounts owed may be declared immediately due and payable. The borrowings under the Credit Agreement currently total $50.0 million.

> *The Company is in the process of assessing the effectiveness of its internal control over financial reporting ("ICFR") and its disclosure controls and procedures in light of the matters disclosed in this Current Report on Form 8-K. The Company will report the results of those assessments in future filings, but expects that, as a result of the identification of at least one material weakness that resulted in the restatement of its unaudited financial statements for the first three fiscal quarters of 2013, it will conclude that its disclosure controls and procedures were not effective as of March 31, 2013, June 30, 2013, September 30, 2013 and December 31, 2013.*

[Emphasis added.]

34.     On September 19, 2014, the Company announced that it was notified by the Division of Enforcement of the SEC that it made the preliminary determination to recommend that the SEC file an enforcement action against the Company alleging violations of Sections 10(b), 13(a) and 13(b)(2) of the Securities Exchange Act of 1934 and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13 and 13a-15 under the Exchange Act. The potential enforcement action stemmed from the SEC investigation previously announced on February 8, 2013 concerning, among other things, its accounting over its PEAKS Program and PEAKS Trust.

35.     On this news, the Company's shares fell $2.70, or over 35%, to close at $4.95 per share on September 19, 2014.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ITT securities during the Class Period (the

"Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ITT securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ITT or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ITT;

- whether the Individual Defendants caused ITT to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of ITT Securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

41.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

42.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

18

- the omissions and misrepresentations were material;

- ITT Securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's Securities; and

- Plaintiff and members of the Class purchased and/or sold ITT Securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

43.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

44.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.     This Count is asserted against Defendants and is based upon Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

47.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of Securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ITT Securities; and (iii) cause Plaintiff and other members of the Class to purchase ITT Securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

48.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for ITT Securities. Such reports, filings, releases and statements were materially false

and misleading in that they failed to disclose material adverse information and misrepresented the truth about ITT's finances and business prospects.

49.     By virtue of their positions at ITT, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

50.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of ITT, the Individual Defendants had knowledge of the details of ITT's internal affairs.

51.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of ITT. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to ITT's businesses, operations, future

financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of ITT Securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning ITT's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased ITT Securities at artificially inflated prices and relied upon the price of the Securities, the integrity of the market for the Securities and/or upon statements disseminated by Defendants, and were damaged thereby.

52.     During the Class Period, ITT Securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of ITT Securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of ITT securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of ITT Securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

53.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act

and Rule 10b-5 promulgated thereunder.

54. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's Securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

55. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56. During the Class Period, the Individual Defendants participated in the operation and management of ITT, and conducted and participated, directly and indirectly, in the conduct of ITT's business affairs. Because of their senior positions, they knew the adverse non-public information about ITT's misstatement of income and expenses and false financial statements.

57. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ITT's financial condition and results of operations, and to correct promptly any public statements issued by ITT which had become materially false or misleading.

58. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various

23

reports, press releases and public filings which ITT disseminated in the marketplace during the Class Period concerning ITT's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ITT to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of ITT within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ITT securities.

59.     Each of the Individual Defendants, therefore, acted as a controlling person of ITT. By reason of their senior management positions and/or being directors of ITT, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ITT to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of ITT and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

60.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ITT.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  October 9,  2014                   Respectfully submitted,

                                           **PRICE WAICUKAUSKI & RILEY,
                                           LLC**
                                           */s/ Brad A. Catlin*
                                           Ronald J. Waicukauski
                                           Brad A. Catlin
                                           301 Massachusetts Avenue
                                           Indianapolis, IN 46204
                                           Telephone: (317) 633-8787
                                           Fax: (317) 633-8797
                                           Email: rwaicukauski@price-law.com
                                                    bcatlin@price-law.com

                                           **POMERANTZ LLP**
                                           Jeremy A. Lieberman
                                           Francis P. McConville
                                           600 Third Avenue, 20th Floor
                                           New York, New York 10016
                                           Telephone:  (212) 661-1100
                                           Facsimile:  (212) 661-8665
                                           Email:  jalieberman@pomlaw.com
                                                    fmcconville@pomlaw.com

                                           **POMERANTZ LLP**
                                           Patrick V. Dahlstrom
                                           10 South La Salle Street, Suite 3505
                                           Chicago, Illinois 60603
                                           Telephone:  (312) 377-1181
                                           Facsimile:  (312) 377-1184
                                           Email:  pdahlstrom@pomlaw.com

                                           *Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, _____*Kamud Jindal*_____, make this declaration pursuant to Section

27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange

Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against ITT Educational Services, Inc. ("ITT Educational" or the

"Company"), and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire ITT Educational securities at the direction of plaintiffs counsel or in

order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or

acquired ITT Educational securities during the class period, including providing testimony at deposition and

trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this

action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in ITT

Educational securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set

forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses

directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.

**Executed** _____*10/6/14*_____
(Date)

_____
(Signature)

*Kumud Jindal*

_____
(Type or Print Name)

**ITT EDUCATIONAL SERVICES INC. (ESI)**                                     **Jindal, Kumud**

## LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|---|---|---|---|
| **Common Stk** | | | |
| 5/3/2013 | PUR | 200 | $17.8200 |
| 5/3/2013 | PUR | 100 | $17.8100 |
| 3/6/2014 | PUR | 333 | $30.1000 |
| 8/29/2014 | PUR | 467 | $8.3568 |
| 8/29/2014 | PUR | 100 | $8.3568 |
| 8/29/2014 | PUR | 100 | $8.3550 |
| 9/19/2014 | PUR | 1,200 | $5.5050 |
| 9/19/2014 | PUR | 300 | $5.5100 |
| | | | |
| **Common Stk - Exercised** | | | |
| 7/18/2014 | PUR | 500 | $15.0000 |
| | | | |
| **Common Stk - Assigned** | | | |
| 6/21/2013 | SAL | 300 | $20.0000 |
| | | | |
| **Options** | | | |
| Jun 22 2013 $20.00 Call | | | |
| 5/3/2013 | SAL | 1 | $0.8100 |
| 5/3/2013 | SAL | 2 | $0.8200 |
| | | | |
| Jul 19 2014 $15.00 Call | | | |
| 6/19/2014 | PUR | 5 | $2.9000 |
| | | | |
| Sep 20 2014 $9 Call | | | |
| 8/29/2014 | SAL | 15 | $0.4700 |
| 9/19/2014 | PUR | 14 | $0.0100 |
| 9/19/2014 | PUR | 1 | $0.0500 |
| | | | |
| Oct 18 2014 $6 Call | | | |
| 9/19/2014 | SAL | (1) | $0.6000 |
| 9/19/2014 | SAL | (14) | $0.5600 |
| 9/19/2014 | SAL | (15) | $0.6000 |

jindal